**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

FILED

00 MAR 17 AM 9:50

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| A.C. MILLER, JR. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. CV-98-S-2371-S |
| | ) |
| NORFOLK SOUTHERN RAILWAY | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

**ENTERED**

MAR 17 2000

### MEMORANDUM OPINION

This action is before the court on four motions filed by
defendant: a motion for summary judgment (Doc. No. 34); a motion
for leave to file a reply brief in support of summary judgment
(Doc. No. 48); a motion to strike plaintiff's expert witness
disclosures and preclude introduction of expert witness testimony
(Doc. No. 33); and a conditional motion for leave to name an expert
witness (Doc. No. 47). Defendant's motion for leave to file a
reply brief is due to be granted. Further, upon consideration of
the motion for summary judgment, briefs, evidentiary submissions,
pleadings, and for the reasons set forth below, this court
concludes that motion is due to be granted. Accordingly,
defendant's two motions relating to the use of expert witnesses at
trial are due to be denied as moot.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in relevant part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See generally Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The movant discharges this burden by showing the court there is an absence of evidence to support the non-movant's case. *See Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593.

2

In deciding whether the movant has met its burden, the court
is obligated to draw all inferences from the evidence presented in
the light most favorable to the non-movant and, also, to resolve
all reasonable doubts in that party's favor. *See generally Spence
v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor
of the non-movant are not unqualified, however. "Mere general
allegations which do not reveal detailed and precise facts will not
prevent the award of summary judgment." *Resolution Trust
Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir.
1995) (citation omitted). Moreover, evidence that is merely
colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537
(11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493,
1498 (11th Cir. 1989), or conjectural, does not create a genuine
issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence
could draw more than one inference from the facts, and if that
inference introduces a genuine issue of material fact, then the
court should not grant summary judgment. *See Augusta Iron & Steel
Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th
Cir. 1988). A "genuine" dispute about a material fact exists if
the "evidence is such that a reasonable jury could return a verdict

3

for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

With the foregoing standards in mind, the following facts either are not disputed, or are stated in a light most favorable to plaintiff.

## II. FACTUAL BACKGROUND

Plaintiff, A.C. Miller, Jr., is a black male who began his employment with defendant, Norfolk Southern Railway Company, on April 25, 1977, working as a swingman. A severe leg injury kept Miller out of work from approximately 1978 to 1982. After recovering from his injury, Miller trained to become a locomotive engineer, by attending engineer's school in McDonough, Georgia, and completing locomotive engineering training. In January of 1984, Miller received his certification as a locomotive engineer, and rejoined Norfolk Southern in that capacity. During all times relevant to this lawsuit, Miller was a member of a union, the

4

Brotherhood of Locomotive Engineers. Miller was represented by BLE in his dealings with Norfolk Southern management, and he was subject to the terms of a collective bargaining agreement between Norfolk Southern and BLE.

The events precipitating this lawsuit began with a drug screening evaluation conducted on August 29, 1995. Miller tested positive for marijuana, and Norfolk Southern suspended his locomotive engineer's certificate. Norfolk Southern's physician, C. Ray Prible, M.D., ordered a follow-up drug test on October 6, 1995. That test was negative, and Norfolk Southern restored Miller's certificate. Prible sent Miller a letter on October 16, 1995, which provided in relevant part:

> You recently gave another urine sample for drug screening. This sample tested negative and you will be returned to service. Attached are the results of this most recent sample. Also, your locomotive engineer's certificate is now restored provided that it is otherwise current.
>
> I remind you that the use of prohibited drugs is contrary to policy. You are therefore instructed to keep your system free of such substances. Should any future test be positive, you will be subject to dismissal.[1]

Miller had no complaint with Norfolk Southern's conduct relating to administration of that drug test or the discipline imposed. He

---

[1] Exhibit 1 to plaintiff's evidentiary submission in opposition to summary judgment (Doc. No. 39), at page delineated as "NS 0894."

5

realized another positive drug test would cost him his job.[2]

The next relevant event occurred on January 16, 1997. Miller and Maurice Thomas, a white Norfolk Southern employee serving as conductor, were guiding a locomotive through Northern Alabama when they received a signal called a "diversion route approach" from a Norfolk Southern dispatcher in Knoxville, Tennessee.[3]  Such a signal informs the engineer of the "possibility that the next signal could be red," which would require the engineer to bring the locomotive to a stop at an appropriate location.[4]  Miller thus prepared to stop the locomotive. He next received a signal of "diversion route clear," however, which means that it is permissible to proceed.[5]  Based on that signal, Miller continued to guide the locomotive at a speed of approximately nine or ten miles per hour. Approximately ten to twenty seconds after receiving the "diversion route clear" signal, however, Miller and Thomas received another "diversion route approach" signal. Miller attempted to bring the locomotive to a halt immediately, but was unsuccessful. The locomotive eventually came to a rest beyond the permissible

---

[2] Further, Miller was repeatedly drug tested from the end of 1995 through 1996. Those test results were consistently negative. Miller has no complaint about the frequent administration of those tests.

[3] Deposition of A.C. Miller, Jr., attached as Exhibit A to defendant's evidentiary submission in support of summary judgment (Doc. No. 36), at 32.

[4] Id. at 33.

[5] Id.

6

area for stopping.

In accordance with federal regulations, Miller and Thomas were immediately subjected to drug testing.[6]  Miller knew he would be tested for the stop signal infraction.

> Q.    You didn't have any objection to being tested?
>
> A.    No.  We [Miller and Thomas] knew they were going to do that, you know.
>
> Q.    Is it your understanding that if there is an alleged rule violation, that there's an occasion which it's proper to test somebody?
>
> A.    Well, if you run a -- they have what they call operations red block.  If you run a red signal, nine times out of ten you are going to be tested for drugs.
>
> Q.    You don't have a complaint about that?
>
> A.    No, no problem with that. ... [7]

The drug tests were administered at the office of Terrence T. Hart, M.D., which is located at a hospital in Muscle Shoals, Alabama. Sharon Dunham, a Licensed Practical Nurse, and Christy Morris, Dunham's assistant, carried out the testing.  Morris collected and packaged Miller's urine sample, and Dunham collected and packaged Thomas' urine sample.  Miller admitted in deposition that Morris was not employed by, or affiliated with, Norfolk Southern.

---

[6]  49 C.F.R. § 219.301(b)(3)(i)(D) provides that "[p]assing an absolute restrictive signal or passing a restrictive signal without stopping (if required)" constitutes cause for the administration of a drug test.

[7]  Miller deposition at 37.

7

Further, it is uncontested that all parties who participated in the
administration and processing of Miller's drug test, including
employees of Dr. Hart and SmithKline Beecham Clinical Laboratories
(the processing laboratory, located in Tucker, Georgia), worked
independently from Norfolk Southern.

Miller claims Morris improperly handled, or otherwise tampered
with, his urine sample, by taking the sample out of his sight for
several minutes.[6]

> Q. Okay. Okay. Look ahead for me, if you will,
> at paragraph twelve of your complaint, and now we are
> talking about the drug test. And that says when
> plaintiff was taken to be tested, the procedures for
> taking said test were not followed by the persons
> conducting the test. The plaintiff's specimen was
> removed from his sight for several minutes before being
> placed in a sealed bag for shipping to the testing
> laboratory.
> Now, tell us about the drug test. Tell us about
> everything that has to do with it.
>
> A. Okay. You know how you take the test, you
> urine in the little thing and they seal it up. Okay.
> Mine's was sealed, put in a bag, ready to be shipped.
>
> Q. Okay.
>
> A. The young lady that was doing mine, it was some
> form in there that she needed to give to the trainmaster.
> She tore the bag open to take the form out. Then she
> took the specimen, urine specimen in the back room. The

---

[6] A Federal Railroad Administration regulation provides that "[b]oth the
individual being tested and the collection site person shall keep the specimen
in view at all times prior to it being sealed and labeled." FRA Regulation 40,
Subpart B, paragraph 17, referenced in Exhibit 3F to Miller deposition.

8

        reason she did this is because she needed another bag.
        She went in the back room with it for, like I said,
        several minutes. Then she came back with it.

              Q.   Okay.

              A.   I knew that that -- that wasn't supposed to be,
        so I told her. I said you are not supposed to do that.
        She says I know what I'm doing. So I left it alone. She
        put it back in another bag, she sealed it back up. So I
        thought I was the only one noticed this, but Mr. Thomas,
        he noticed it too. [9]

Both Morris and Dunham dispute Miller's account. Morris' letter to

Louise   Rozos,   Norfolk   Southern's   Substance   Abuse   Testing

Supervisor, summarizes their position:

     This letter is in regard to Mr. A.C. Miller's drug screen
     on 1/16/97. I, Christy Morris, was assisting with Sharon
     Dunham, ALPN.   After sealing the SmithKline bag, I
     realized that I had not put the federal [drug] testing
     custody form in the bag. I reopened the bag in front of
     Sharon, and Mr. Miller to put the form in. The urine was
     sealed in [it's own] container and was never reopened
     after being sealed.   It was the bag not the urine
     container that was reopened. [10]

Miller puts on no evidence, other than his opinion, to indicate

that Morris either tampered with his urine or mistakenly switched

his urine vial with that of another individual.

              Q.   Is it your claim that the specimen was tampered
        with?

              A.   Yes, either tampered -- my claim is it was

─────────────────────────
     [9] Miller deposition at 44-45.

     [10] Exhibit A to affidavit of C. Ray Prible, M.D., attached as Exhibit C to
defendant's evidentiary submission in support of summary judgment.

                                  9

either tampered with or I don't know if there were any
more specimens back there or not, so maybe they were
exchanged, I don't know. I don't know what happened when
[Morris] left.

Q.   Okay. When you put the lid on the specimen, is
there any type of tape that goes over that, any kind of
seal on the actual jar itself.

A.   I think they put some kind of tape on it.

Q.   Okay. When you set it on the counter, was it
sealed over with tape?

A.   When I set it on the counter, I just -- I had
screwed it on, set it on the counter. Yeah, they put a
piece of paper over it for you to initial it.

Q.   Had you initialed it at that point?

A.   Yes.

Q.   Okay. Do you claim that someone from the
railroad tampered with your specimen?

A.   No, I don't -- I don't know who tampered with
it, if it was tampered with. ... [11]

In sum, both parties agree that the sealed vial was removed from
one bag and placed into another, so that the custody form would be
included.

While Thomas' drug test results were negative, Miller's were
positive. Dr. Prible notified Jeffrey G. Yates, Norfolk Southern's
Division Superintendent, of Miller's test results in a letter dated
January 22, 1997, which provided in relevant part:

---

[11] Miller deposition at 113-14.

10

> The urine sample furnished by [Miller] on January
> 16, 1997 tested positive for marijuana.
>
> By letter dated October 16, 1995, the Medical
> Director wrote to remind the above-named employee that
> the use of prohibited drugs was contrary to Company
> policy and he instructed him/her to keep his/her system
> free of prohibited drugs. The above-named employee was
> also advised that if a future test was positive for
> prohibited drugs, he/she would be subject to dismissal.
>
> I am notifying you of these facts so you can proceed
> with disciplinary action if appropriate.    Any
> disciplinary action must comply with the requirements of
> the collective bargaining agreement(s) applicable to the
> craft(s) in which the employee holds seniority.[12]

Prible also enclosed a copy of the laboratory report to Mr. Miller

on that date. Norfolk Southern terminated Miller's employment on

February 14, 1997, after a hearing was conducted pursuant to

Article 31 of the collective bargaining agreement.   The hearing

focused not only on whether Miller and Thomas had committed a stop

signal infraction, but also on the propriety of the drug tests.

Thomas was suspended from work for approximately thirty to sixty

days after the hearing, presumably for the stop signal infraction.

Miller contacted Dr. Prible by letter on April 30, 1997,

requesting that a "split sample" of his January 16, 1997 urine

specimen be tested. Prible replied to Miller's request by letter

on March 5, 1997. That letter provided in relevant part:

---

¹² Exhibit 1 to plaintiff's evidentiary submission in opposition to summary
judgment, at page delineated as "NS 0935" (emphasis in original).

11

> Please be advised that there are NO DETECTION LEVELS FOR
> TESTING OF THE SPLIT SAMPLE. Any trace of prohibited
> substances is reported as positive.
>
> Let me further explain the process for requesting a
> split sample test of positive results:
>
>> 1. You must choose to have the split sample
>> tested by [a certified laboratory] other than
>> the one in which the primary sample was tested
>> . . . .
>>
>> 2. All charges for the cost of the test is
>> your payment responsibility. This includes
>> all charges to forward the specimen to another
>> lab, as well as all charges for the specimen
>> analysis. If the lab test results are
>> negative, this amount will be refunded to you
>> in full. [13]

Miller wrote back to Prible on May 15, 1997, stating that he wished

to have a "split sample" tested at Associated Regional & University

Pathologists, Inc., located in Salt Lake City, Utah. Those test

results were also positive.

Miller exhausted his rights under the collective bargaining

agreement in disputing his dismissal. He appealed the post-hearing

decision to Yates, the Division Superintendent, and then to Norfolk

Southern's Labor Relations Department. Miller was denied relief at

both levels of appeal. Miller next made a presentation to the

Board of Adjustment, which issued separate decisions relating to

the stop signal infraction and the drug test. In Award No. 227,

---

[13] Id. at page delineated as "NS 0950" (emphasis in original).

12

the Board concluded Miller had passed a stop signal without authorization:

> The Board's review of the facts presented[] leads to the conclusion that discipline was justified for running by a signal, however, we believe the discipline was too severe considering the circumstances. Our disposition under the prevailing facts would be a reinstatement to service, without compensation, however, the Board must take cognizance of a second discharge case, involving the same Claimant, which deals with a positive drug test for marijuana. The Board's decision in the latter case, upholding the discipline, will be issued in a separate opinion, although it is incorporated by reference herein. Thus, for the purpose of this award, the Claimant's return to service is a moot point.[14]

In Award No. 228, the Board concluded Miller's drug test had been administered properly:

> Our analysis of the record convinces us the collection site parties complied with [Federal Railroad Administration requirements] and there doesn't appear to be any valid challenge to those facts. _After_ it [the urine sample] was sealed and labeled, the sealed specimen was placed in another bag which was reopened because the testing party had omitted putting the "Federal drug testing contract form" into the bag.
>
> . . .
>
> It seems apparent, there was no rational basis for concluding the collection site procedure was flawed under the recited facts; consequently there is no reason for this Board to revisit the question whether the technicians could be compelled to attend the trial in the absence of powers of subpoena.[15]

---

14 Exhibit 3E to Miller deposition.

15 Exhibit 3F to Miller deposition.

Miller commenced the present action on September 21, 1998.

## III. DISCUSSION

Miller claims Norfolk Southern's decision to terminate him

violated 42 U.S.C. § 1981.[16]  That statute provides:

> (a) All persons within the jurisdiction of the
> United States shall have the same right in every State
> and Territory to make and enforce contracts, to sue, be
> parties, give evidence, and to the full and equal benefit
> of all laws and proceedings for the security of persons
> and property as is enjoyed by white citizens, and shall
> be subject to like punishment, pains, penalties, taxes,
> licenses, and exactions of every kind, and to no other.

> (b) For purposes of this section, the term "make and
> enforce contracts" includes the making, performance,
> modification, and termination of contracts, and the
> enjoyment of all benefits, privileges, terms, and
> conditions of the contractual relationship.

> (c) The rights protected by this section are
> protected against impairment by nongovernmental
> discrimination and impairment under color of State law.

42 U.S.C. § 1981. More specifically, Miller contends that Norfolk

Southern's decision to terminate him, while returning Thomas to

work following a suspension, constitutes race discrimination.  He

further bases his race discrimination claim on the allegedly faulty

drug test, and the fact that "[a]t the hearing before the Special

Board of Adjustment, plaintiff was not allowed to present certain

---

[16] Miller's complaint also alleged a violation of 42 U.S.C. § 1983, based
on Norfolk Southern's failure to afford him procedural due process.  *See*
Complaint (Doc. No. 1) ¶ 22.  The court dismissed that claim, upon motion by
Norfolk Southern, in an order entered on December 4, 1998.  *See* Doc. No. 11.

14

witnesses that he had requested nor was the issue of the inappropriate drug test properly addressed."[17]

As a preliminary matter, this court notes the significance of the fact that Miller only seeks redress of Norfolk Southern's decision to terminate through a Section 1981 race discrimination claim. He has not properly stated a claim for review of the decision of the Board of Adjustment by this court, despite certain allegations in his complaint. Were he to have done so, this court notes that its scope of review would be a very limited one. See Henry v. Delta Air Lines, 759 F.2d 870, 871-72 (11th Cir. 1985) (noting that "[t]he findings of the Board are final and conclusive and subject to an extremely limited review by the federal courts"). The Railway Labor Act provides that a district court has jurisdiction to set aside an award issued by the Board of Adjustment in three narrow circumstances:

> On such review, the findings and order of the [Board] shall be conclusive on the parties, except that the order of the [Board] may be set aside, in whole or in part, or remanded to the [Board], for failure of the [Board] to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to matters within the scope of the [Board's] jurisdiction, or for fraud or corruption by a member of the [Board] making the order.

45 U.S.C. § 153(q).

---

[17] Complaint ¶ 15.

15

Both parties spend a great deal of time briefing the issue of the preclusive effect of the decision by the Board of Adjustment. Norfolk Southern argues that Miller's race discrimination claim is a "veiled collateral attack on the Board's decision affirming plaintiff's dismissal for drug use."[18]   This court disagrees, because Miller was not litigating the issue of race in association with his wrongful termination claim before the Board.

Miller, on the other hand, opposes summary judgment largely on the basis that the Board committed a number of missteps in upholding Norfolk Southern's decision to terminate.[19]  Again, this court is in no position to review the merits of the Board's decision, given the substance of plaintiff's claim.   Rather, it focuses on whether Miller has created a genuine issue of material fact regarding whether Norfolk Southern's decision to terminate him was motivated by race.    Put another way, because Miller has instituted this action pursuant to Section 1981, this court's scope of review is much broader in scope than it would be under 45 U.S.C. § 153(q).   *Cf. Peterson v. BMI Refractories*, 132 F.3d 1405, 1412 (11th Cir. 1998) (undertaking *de novo* review of Section 1981 claim

---

[18] Defendant's brief in support of summary judgment (Doc. No. 37), at 11.

[19] *See* Plaintiff's brief in opposition to summary judgment (Doc. No. 40), at 9-11.

16

after plaintiffs filed grievances pursuant to a collective bargaining agreement).

To recover under Section 1981, Miller must show: (1) that he is a member of a racial minorirty; (2) he was subjected to intentional discrimination by Norfolk Southern because of his race; and (3) that such unlawful discrimination occurred while Miller was attempting to "make and enforce contracts," as that term is defined by Section 1981(b). *See Baker v. McDonald's Corporation*, 686 F. Supp. 1474, 1481 (S.D. Fla. 1987), *aff'd*, 865 F.2d 1272 (11th Cir. 1988). Norfolk Southern concedes Miller has met the first and third requirements of this test. Accordingly, this court addresses whether Miller has adduced sufficient evidence to create a genuine issue of fact on the issue of whether Norfolk Southern engaged in unlawful race discrimination.

The analytical framework employed for claims brought under Title VII to the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991, also applies in the context of claims bottomed upon Section 1981. Both statutes require an employee to "prove an intentional discriminatory motive by presenting either direct evidence or circumstantial evidence of racial animus." *Grooms v. Wiregrass Electric Cooperative, Inc.*,

17

877 F. Supp. 602, 607 (M.D. Ala. 1995) (collecting Supreme Court and Eleventh Circuit authorities). Only the most blatant remarks harboring discriminatory intent constitute direct evidence. *See generally Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999); *Wright v. Southland Corporation*, 187 F.3d 1287, 1293-1303 (11th Cir. 1999). Miller has produced no direct evidence of discriminatory intent on behalf of Norfolk Southern.

This court therefore must analyze his circumstantial evidence of race discrimination under the burden-shifting framework originally articulated by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that tripartite scheme, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. If successful, the burden of production shifts to the defendant, which must articulate a legitimate, nondiscriminatory reason for the challenged employment action. If that burden is met, the plaintiff must produce evidence indicating that the defendant's stated reason is mere pretext for unlawful discrimination. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (noting that a plaintiff must put on enough

18

evidence to permit a jury to reasonably "conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct'") (quoting *Cooper-Houston v. Southern Railway Company*, 37 F.3d 603, 605 (11th Cir. 1994)). The plaintiff carries the ultimate burden of persuasion of showing that the defendant intentionally discriminated against him. *See Wright*, 187 F.3d at 1292 ("In sum, the plaintiff in an employment discrimination lawsuit always has the burden of demonstrating that, more probably than not, the employer took an adverse employment action against him on the basis of a protected personal characteristic.")

To establish a *prima facie* case of race discrimination, Miller must prove: (1) that he is a member of a protected class; (2) that he was qualified for the position; (3) that he was discharged; and (4) that a person from outside his protected group replaced him, or the position remained open. *See Grooms*, 877 F. Supp. at 608. A plaintiff may alternatively satisfy the fourth element by showing "that the misconduct for which the employer discharged the plaintiff was the same or similar to what a similarly situated [white] employee engaged in, but that the employer did not discipline the [white] employee similarly." *Lathem v. Department*

19

*of Children and Youth Services,* 172 F.3d 786, 792 (summarizing

elements of *prima facie* case of sex discrimination under Title

VII). In *Holifield v. Reno,* 115 F.3d 1555 (11th Cir. 1997), the

Eleventh Circuit elaborated on the "similarly situated"

requirement:

> To make a comparison of the plaintiff's treatment to that
> of non-minority employees, the plaintiff must show that
> he and the employees are similarly situated <u>in all
> relevant respects</u>. In determining whether employees are
> similarly situated for purposes of establishing a *prima
> facie* case, <u>it is necessary to consider whether the
> employees are involved in or accused of the same or
> similar conduct and are disciplined in different ways</u>.

*Id.* at 1562 (citations omitted) (emphasis supplied).

Miller satisfies the first three requirements of the *prima

facie* case.[20] With respect to the fourth element, however, Miller

has not made either of the two alternative showings. He proffered

no evidence indicating that a white employee replaced him upon

termination. Nor has he established that the position remained

open after his termination. *See Grooms,* 877 F. Supp. at 609

(confirming plaintiff failed to establish *prima facie* case of race

---

[20] In *Rosenfield v. Wellington Leisure Products, Inc.,* 827 F.2d 1493 (11th
Cir. 1987), the Eleventh Circuit noted that "the *McDonnell Douglas* test has been
modified in cases where a plaintiff was discharged from a previously held
position (as opposed to failure to hire or to promotes cases) ... [since] 'the
prong requiring proof of qualification is removed ....'" *Id.* at 1495 n.2 (quoting
*Pace v. Southern Railway System,* 701 F.2d 1383, 1386 (11th Cir. 1983)).

20

discrimination, because "the record is devoid of any evidence that an employee outside the protected class replaced him or even that the position remained vacant").

Moreover, Miller has not shown that Thomas was disciplined less harshly for the same wrongful conduct, because he and Thomas were not similarly situated. Miller's drug test result was positive; Thomas' was negative. Both were disciplined for the stop signal infraction. Further, the Board of Adjustment indicated that, had Miller not tested positively for marijuana use, discharge would not have been an appropriate disciplinary sanction. *See supra* page 13. What distinguishes Thomas' suspension from Miller's termination is the fact that Miller committed another violation of Norfolk Southern's drug policy. Accordingly, this court cannot conclude that Miller and Thomas "were involved in or accused of the same or similar conduct and [were] disciplined in different ways."[21] *Holifield*, 115 F.3d at 1562. Because Miller has failed to set forth a *prima facie* case of race discrimination, summary judgment is due to be granted in favor of Norfolk Southern.

---

[21] Miller stated in deposition that he felt he was treated differently, on account of his race, than the Norfolk Southern dispatcher involved in the communication of diversion signals to him on January 16, 1997. *See supra* pages 6-7. Again, this court concludes from the dearth of evidence that the dispatcher was not "similarly situated" to Miller for purposes of establishing a *prima facie* case.

21

Even if this court were to presume that Miller had established a *prima facie* case of race discrimination, he still cannot show that Norfolk Southern's legitimate, non-discriminatory reason for terminating him was pretextual.  Norfolk Southern based its decision to terminate Miller on his failure to remain drug-free after initially testing positive for marijuana.  Miller was warned, and understood, that a second positive drug test would result in dismissal.

As noted by Norfolk Southern, this case is factually analogous to the decision in *Grooms v. Wiregrass Electric Cooperative, Inc.,* 877 F. Supp. 602 (M.D. Ala. 1995).  In *Grooms*, a heavy equipment operator was discharged by his employer for failing a drug test. The court concluded plaintiff's argument that defendant somehow "manipulated the [drug] testing procedure and/or test results" was without merit, "[b]ecause the evidence shows that the [defendant] did not participate in the testing procedure." *Id.* at 608.  Here, the drug tests were performed by medical personnel working independent from Norfolk Southern, and were analyzed "by an independent laboratory, certified by the federal government to administer said drug tests." *Id.*

Norfolk Southern had no choice but to "take action and rely

22

upon the results" in deciding whether to reinstate Miller after the
stop signal infraction. *See id.* at 609 ("An employer who retains
an employee who has tested positive for controlled substances
potentially could face enormous tort liability if that employee
endangers third parties while acting in the line and scope of his
employee relationship."). In fact, 49 C.F.R. § 219.104 orders
railroads like Norfolk Southern to "immediately remove" an employee
like Miller from service upon a showing of use of controlled
substances, in violation of either 49 C.F.R. § 219.101 or 49 C.F.R.
§ 219.102. Simply put, Miller has adduced no evidence indicating
that    Norfolk    Southern's    reasons    for    termination    were
discriminatory.

## IV. CONCLUSION

For all of the foregoing reasons, defendant's motion for
summary judgment is due to be granted. An order consistent with
this    memorandum    opinion    shall    be    entered    contemporaneously
herewith.

DONE this 17th day of March, 2000.

United States District Judge

23